Good morning, Your Honors. David Kozak for Appellant Trantina. I would like to reserve any unused time I have for rebuttal. I'd like to, I guess, try and summarize what happened in this particular transaction. We do know that State Farm paid money to Trantina over a number of years. And the question seems to be, what did State Farm receive in return for paying Trantina money? We know that State Farm did not receive any current efforts from Mr. Trantina. We know that State Farm did not receive any long-term insurance contracts from Mr. Trantina or his efforts, because property and casualty insurance contracts typically only run for six months to a year at most. So by process of elimination, that leaves us with the only possible items State Farm could have received from Mr. Trantina were, one of the items was his relationships with approximately 17,000 to 18,000 insured and customers. Counsel, realistically here, isn't this just a garden variety State Farm agency relationship, one that is enjoyed by thousands of people across the country, virtually identical wording? And indeed, I think this very contract was dealt with by the Baker case in the Seventh Circuit. How do you distinguish the Baker case from this case? We have two distinguishing areas, Your Honor. First is a factual distinguishment. In this particular case, and as a step back, what happens in these transactions is that effectively when an agent signs on, so to speak, with State Farm, they receive virtually the exclusive right to operate within a specific area. If they're the first in line, their area is huge. And one of the points that State Farm tries to make is that State Farm does not want its agents competing with each other. It wants its agents competing with agents from other insurance companies. So the objective is to assign an area, a territory that one agent can reasonably be expected to handle. In this particular case, since Mr. Trantina had his area, his territory for 60 years, and he was literally the first person on the block, so to speak, his area was huge. And when it was reassigned, it was reassigned to a number of State Farm agents, which allows State Farm to build by multiplying, because now it has the efforts of a number of agents, where before it had only one serving that particular area. And in this particular case, the factual difference between this case and Baker is that certain of these agents actually occupied the same space that Mr. Trantina had used as his office space for years and years. Yes. That's great. But State Farm could terminate this agreement any time it wanted, couldn't it? Could it terminate the agency agreement? Yeah. Absolutely. It had to make some payments. Pardon me? Yes. It had to make some payments to your client, but it could terminate the agreement at any time, right? As could the agent, yes. Indeed, indeed. So unlike a stock or unlike a piece of property, like a house or something like that, where your client owns something that can't be terminated by the, if you will, the issuer or something like that, there was an arrangement made where your client had to, if the contract gets terminated, then he gets certain payments, a long-term commission kind of arrangement. That's just ordinary income. That's just a contract for services, basically. And your client knew that when he entered into this agreement. Why is this a capital asset? Excuse me, but it's not really long-term commissions, because part, if we look at it from the other side. I'm speaking in terms of the payments. The payments get paid out over a period of time. That's true, but they're not related to renewals. I understand that, but they're related to the termination of the agreement. Correct. And your client signed it. Let's say your client had the agreement for two days, and then it gets terminated. Would you contend that this was a capital asset then? Well, no, I would not in two days. How about a week? Well, a week, probably not either, Your Honor. A year? A year. I guess I'd have to see exactly what the facts were in that particular case. So your allegation is that the longer the contract goes on, the more it morphs from capital, I mean, from ordinary income to capital income. In other words, it changes its nature by virtue of its longevity. In some respects, yes, and that argument is relying upon Gillette Motor Transport, which describes, I mean, the U.S. Supreme Court has essentially said that as something becomes more valuable as time goes on, it's a capital asset. And that's part of the argument that has been made and is being made here. But in addition, to address the opposite of the point that you just raised, there's nothing to prevent the agent, once the agency agreement is terminated, from sending out notices to insureds or 2,000 or 200,000, however many the agent may be in contact with, which says, I am no longer associated with State Farm. You have, you know, do what you wish as an insured. But when the agents do not notify the insureds that they're no longer with State Farm, it's a principle agent relationship, the question arises, who is the insurance agent, the agent for? Is it the agent for the company or is it the agent for the insured? Pretty much every insured out there refers to my insurance agent. They pay their insurance agent. When they have a problem, they call their insurance agent. If there's a problem with the insurance company, they expect their insurance agent to interface on their behalf with the company underwriting the insurance policy. Mr. Trantino was free to go out and sign up with all State. He just wasn't free to go back and contact anybody that had been, that had an insurance policy that he was servicing. You mean after the termination? After the termination of the agreement. His no-compete clause forbid him from contacting people that had insurance contracts with State Farm that he had serviced. But it didn't prohibit him from going over and working across the street for all State. Correct. What I'm But it's, excuse me, but it's the relationships with those insureds and the But he can't transfer them to anybody. He can't give them to his son. He can't give them to somebody else and say, here, I want to sell you the Trantino Insurance Agency and I've built up all this goodwill over this time, and so I want you to take Trantino and continue my good name. And now we'll call it Trantino and Smith. Well, and I thought you'd enjoy that. I mean, there's two responses to that. First is that that is, the arrangement that State Farm has is that they want to see an agency continue. But they want to know, they want to have total control as to where it goes and how it continues. So when you retire or terminate your agreement, they will pay you, in effect, a mathematical calculation based upon the value of the size of what you're doing. And I think the point in favor of your client, I think a good point in favor of your client, is the fact that Mr. Trantino, by working hard and over a long period of time for State Farm, is entitled to larger payments once he terminates with State Farm. So that is, whatever he's building up, whatever we're going to call it, his goodwill, his sweat equity, whatever, in his client base that he can claim as his own until he terminates with State Farm, that by his good labors, he's going to have a larger payout when he terminates. The problem that I have, the problem I think that your client has, is that he's got nothing to pass on. He's got no property rights in his business at all. Well, historically, though, that's not true. And there was a Well, historically, it may not be true, but that seems to be the current reality. Well, no. Excuse me a second, but there was an incident. One of the other retired large agents in Missouri, large State Farm agent, last name of Kelly, retired, went through this exact same scenario. His son became a State Farm agent. State Farm only wanted to assign his son approximately 10 percent of his insured slash customers. What Mr. Kelly and his son did was they contacted each one of those customers, and those customers then went to State Farm and said, it's our insurance policy. We have the right to have it placed with any State Farm agent we want, and we demand that it be placed with Mr. Kelly Jr. That's all initiated by the insured. There's no property right that the father can pass on to his son. He can't say, son, I'm giving you the business, because that's not permitted under his agreement with State Farm. That's your client's problem, is you haven't got the property right that you can, an asset that you can build up so that you can claim a capital gain here. Well, effectively, though, as I said, the facts in this case indicate that what was who took it over had the same address, the same physical location, and the same phone numbers, because State Farm allowed them to stay there. State Farm assigned those contracts out to whoever it wanted to. There was no obligation. Mr. Trantina had no control over that. It's not Mr. Trantina's to assign. Mr. Trantina did have total control over the telephone numbers. They belonged to him. Could he have sold them? Directly to the agents? He possibly could have. He couldn't have walked across the street, worked for Allstate, and kept on to those phone numbers and started phoning those folks, though, could he? He couldn't have contacted the folks. Right. That's correct. But he could have retained the telephone numbers, the same way that he could have kept his agency going by literally doing almost nothing himself and bringing in younger and younger and younger people. Mr. Kodak, I want to return to a question that Judge Smith asked you and see if I can get you to focus on it. We have a case precisely on point. I don't see how it could be any more on point. What's hard for our panel is, or what makes it challenging for our panel is, it's in the Seventh Circuit. We're not bound by it unless we think that it's persuasive. Now, I heard you try and distinguish it factually. I don't think that's right. I think that the Seventh Circuit's opinion in Baker is wrong. On the law, I don't have a response for you. The facts are somewhat different. The arguments that we're making are different than the arguments that were made in Baker. In Baker, they were making the argument that this person had worked for a number of years, retired, received a lump sum payment or payment over a period of years, rather, and that should be a capital asset. Here, what we're arguing is that, effectively, what happens is that Mr. Trantina sells his business to State Farm because that's the arrangement they both entered into on day one, because that gives State Farm various rights. It gives State Farm the right to divide up this territory amongst a number of agents, which it otherwise wouldn't have if it didn't get the territory back. It buys, in effect, Mr. Trantina's continued cooperation by not going to the insureds and telling them, I'm gone. Do what you want. If you relied on me as your State Farm person, you're on your own now and you may want to look at a different insurance company. So there actually were property rights that were received by State Farm, as a result of this transaction. Those arguments were never made. But they owned them all along. Well, they owned the rights to the policies. They did not have any relationship with the customers, with the insureds. Well, but then we get back to this, what is essentially sophistry. You're saying that your client owns the phone numbers, but he couldn't use the phone numbers to call the clients once there's a termination. So it's almost a Washington, D.C. sort of thing where you can communicate, but you can't talk to anybody. Well, he could have answered it, though. Not in Washington. The phone list doesn't do you any good. And the phone list wouldn't do him any good except to identify who was calling in. He can't take the phone numbers and call out. I believe Judge Smith was speaking about Mr. Trantina's phone numbers. So he could have walked across the street, opened up another insurance agency, would have retained those phone numbers, because according to the phone company records, they belonged to him. He could have retained the numbers but not called them? Correct. He could have just answered the calls. When they had questions, they would have called the number that they were used to calling for 40, 50, or 60 years, and the same person would have answered that answer for 40, 50, or 60 years. I have to say, in the big scheme of property rights, that's not a lot of – that's not a lot of – that's not a very big bundle of rights. You may be correct, but it's a bigger bundle than was argued in Baker. And you ask – Okay. You ask, you know, what distinguishes us from Baker. Okay. I mean, effectively, we are arguing that, in effect, Mr. Trantina did transfer his business, what could only be, in effect, his so they could make more money off more agents than in the past. And when you're dealing with a business, under Gillette Motor Transport, we are dealing with a situation, a bundle of rights, that qualifies as a capital asset, and under Internal Revenue Code section 1221, we don't meet any of the exceptions. The code says it's a capital asset except if it meets any of these requirements. And under 1221, we don't meet any of the exceptions. So, by definition, we must be a capital asset. You know, I just – if I may get back to Baker here, because I think, as Baker says, dealing with a state farm contract, it says while – I'm looking at page – let's see, what page is it? It doesn't matter. Page 794 of the Baker case says, While Baker built the insurance agency, the tools he used were on loan from State Farm. State Farm's termination payments were not for the sale of the business where a buyer was able to step into the seller's shoes, which is the very point that Judge Biby made. Baker owned nothing, thus he could sell no assets, including Goodwill. We agree that Goodwill was developed during Baker's tenure. However, it was not his to sell. I don't see how you distinguish this case from that. It's really on all fours, whether or not your client had his own phone numbers. Because the relationships with the client is, in effect, the relationship with the agent, not the relationship with State Farm. That point was not argued at all in the Baker case. Does that make it a capital asset? Well, Goodwill – Even if you're correct, why does that make it a capital asset? Goodwill is a capital asset. And what you have here, bless you, is a situation in which the larger the agency, the more Goodwill leading to a larger retirement payment, a larger termination payment. So there is a direct correlation between the amount of Goodwill the agent has developed over the years and the amount of money that agent receives from State Farm. That's kind of the amoeba theory of capital gains. You get little pseudopods sticking out all over. The agency converts from an ordinary income to capital gain. It's intriguing, but more for microbiology than tax law, perhaps. Thank you. Good morning, Your Honors. Bridget Rowan with the Department of Justice, representing the United States as the appellee in the case. May it please the Court, our view is, of course, that the Baker case is squarely on all fours with this case. It involved a State Farm agent under a – from a reading, a close reading of the opinion was identical to the agreement in this case. Similar sort of situation. Mr. Baker worked for many years for State Farm and built up quite a sizable business on behalf of State Farm. And then terminated his relationship. He, in essence, retired, as did Mr. Trantino, and then received the terminations payments pursuant to that agreement. The Seventh Circuit in Baker found that that was ordinary income, a decision that, of course, we completely agree with and which the district court noted in her decision below and reached the same conclusion on the facts of this case. To place the matters in context, too, of course, ordinary income is the norm in tax law, and capital gain is an exception. So in order to fit within the – to achieve the preferential treatment that's accorded capital gains, taxpayer has to show that there is a capital asset that he has sold and has either realized a gain or a loss. Mr. Trantino here, as I think the Court has indicated by some of its questions, he owned nothing. He had a service relationship with State Farm. He was obliged to work on its behalf to garner policies. And they were obliged to give him commissions. And then if he worked for a certain number of years, he would get termination payments based on how successful he was in building up that – building – in accruing policies. But under the terms of the agreement, he couldn't – he couldn't buy or – he couldn't sell the agreement itself. That wasn't an asset that he could dispose of. All of the policy materials and information were property of State Farm. All of the money that he – all the policy information and all the policies were the property of State Farm. All the money that he received pursue – or that came in pursuant to those policies, he had to hold in trust for State Farm. What about the phone numbers, not of – not of Mr. Trantino, but of his customers? That was State Farm information. I would submit, Your Honor, that anything related to the – anything in the nature of policy information under Section 1D of the agreement was the property of State Farm. Now, there's that separate question of the – of the offices that he leased, perhaps in his name or the name of his company, the phone numbers that he may have obtained under the name of his own company. In that respect, again, I would say the case is not distinguishable. That situation is not distinguishable from the case in Baker, where the successor agent who was appointed by State Farm, and the agent has no say whatsoever on that appointment of a successor. Who took over Mr. Trantino's territory? How many people? I don't get their names, but how many people? There – it's addressed – there's not very much in the record about the whole position that's included in the record. That's excerpts of Record No. 21 at page 36. There's a discussion of the individuals who took over. Let me look at three, four, five. I think it was two – these two agents took over the business. I mean, Mr. Trantino did a very – he was a very, very successful agent for State Farm. And so more people were needed to take on his – What did Mr. Trantino – after the contract was terminated, what did he take away from the agency other – other than the – his own personal phone number, whatever office furniture he owned? What did he take away from it? And the payments, of course, that he was entitled to under the agreement. Under the agreement, the agreement says he takes nothing other than those payments. There's nothing in the record to suggest that he took anything other than – So he got the payment, but there was no – there were no assets that he took out, nothing that he owned. That's correct. And the record is not clear on the – what happened to the physical premises. And it's quite possible that he had a subcontractor sort of relationship with whomever it was he leased those properties from. But that would be a separate issue. Right. And the only restrictions on his conduct after he left was that he could not solicit the former policy or the policyholders that he had solicited – that he had obtained for a one-year period? That's what the agreement says. Other than that, he was free to do whatever he wanted? Yes, Your Honor. I think after a year, he could have set – he could have – I'm not sure, actually, whether he could ever have gone back to those individuals or not. But that was essentially it. He could have set up as a – as an agent, but he – those particular policies would have been off limits. Counsel, the opening brief argues that what the asset was that Trantino was holding was his agreement with State Farm, which obligated State Farm on termination of the agreement to make certain payments to him. Those payments would be fixed by a schedule and would – and would turn on a couple of things, including how many – how many policies he was servicing. So the longer Mr. Trantino works, the harder he works, the more split equity he puts into this business, the larger the payments at the end of this. Now, was that agreement assignable? Were the payments under that agreement assignable? Could they have been attached? The agreement itself was not exchangeable or assignable, but – I know they can't – I know he can't take the – I know he can't take the leases and the phone numbers and the records and say, here, son, I want you to continue Trantino Insurance Company. But can the agreement itself be assigned, could it have been attached by somebody else pursuing Mr. Trantino, say, this is a valuable commodity in the nature of stock and it's going to be worth quite a bit of money here when Mr. Trantino steps away from this business? The Section 6b of the agreement, Your Honor, addresses that particular point. And because State Farm was relying on this individual relationship with Mr. Trantino, he could not assign his ability to be an agent for State Farm. Okay. I understand he couldn't assign his ability to be an agent. Could he assign the agreement itself? I understood the opening brief to argue that the property at issue here, that is, the asset, is the agreement itself. Under Section C – I'm sorry, Your Honor, Section 6, subsection b, neither the agreement nor any interest thereunder can be sold, assigned, or pledged. Now, he – so the agreement itself cannot be sold or assigned or pledged. So he cannot assign the agreement and the insurance business relationship that that represents, or any of the rights and duties and materials and policies and so forth and so on. So he assigned the payments that were to be made? However, he could assign, with the consent of the company, a right in a sums due that had become due to him under the agreement, which is not – But did anything become due? Before he left? Well, his commissions would have been due. Well, those were ordinary commissions. That's not a termination. Right. The termination – nothing would be due under the termination agreement until he notified State Farm that, terminating the agreement, he had to hand over all the property. Once he did that, he was entitled to certain payments for a year, and that was during the non-compete sort of period. And if he honored that person – But none of those payments could be assigned before the termination, right? That's correct. That's correct. Because they would not have been due. There would have been those various contingencies that had to be fulfilled. In that sense, I would submit, Your Honor, it's not really any different from a creditor's – presumably, he would be able to do this in order to satisfy a creditor to assign, you know, I have these termination benefits that are coming to me, and I owe you a debt, so I'll assign my right to that money to you, and not all that different from a creditor garnishing someone's wages or other monies that would be due under a compensation agreement. It's not unusual for compensation agreements to have various kinds of bonus features to them based on the performance of the – Could he have set – could he have sold an interest in the sums that would be due at some future point and sold it, let's say, to a speculator? Somebody's willing to say, look, I think you're going to work really hard, and you're going to hedge your bet just a little bit, but I'm betting this is a really successful thing, and it's going to be worth quite a bit. And that might distinguish it from our lottery case. That – well, I'm not so sure it would be distinguished by – that's a very interesting question. I think – I think there we would argue that that would be a substitution for income kind of situation where what the taxpayer is trying to do is coalesce future – a future income stream, which by its nature is ordinary income, into a capital asset and receive a favorable capital asset treatment at the point that he enters into that sort of agreement. So I would say that situation is not really distinguishable from the McGinnis case. It is like the lottery situation. But really, this is really more like a CEO of a company that's got some kind of a contract, a golden parachute, if you will, and somebody says, I'll give you a million dollars for your golden parachute payments if and when that occurs. It was ordinary income before. It's ordinary income afterwards. That's precisely, Your Honor, and that would be the analogy I would make between these sorts of termination benefits and some sort of nice benefit package that I said. And are golden parachutes treated as ordinary income? Yes, Your Honor. And stock options, for example, an executive who gets stock options based on performance, if he leaves the employment of his corporation and then exercises those stock options, difference between the option, the strike price and the market price is ordinary income to the individual, and that's a benefit of compensation. Now, for a while, the service treated covenants not to compete in a different way than, of course, we've got a new code section now, but weren't they treated as capital gains at one point? I think I can't answer that. Could this be characterized, at least in the 1-year period, as a covenant not to compete? Your Honor, I guess I'm not altogether sure about the first question that you're asking, whether, in fact, that those were treated as and who treated them. It was actually quite common when people would sell their businesses that they would divide up the purchase price and then they'd have somebody allegedly, they were going to contact the former customers and they, for a long time, were treated as capital assets. I think the Congress knocked that out. I don't remember what the date was, but I just wonder what, since this is a relatively old contract, it raises an interesting issue. Well, it's from the 70s, I think. This contract, yeah. This contract, late 70s, so it's not all that old. But there, I would say, again, that was a condition of an employment contract, a pretty typical provision in many sorts of employment agreements where you're not supposed to sign such a condition as part of the employment contract. And when that relationship is severed, that would not be teased out as a capital asset portion of the agreement. Counsel, was Mr. Trantina entitled to take, to count any expenses against his income or against this? Is there anything, has he taken anything as sort of ordinary expenses? Would you have to treat, if he had, wouldn't you have to go back and treat those differently? I'm not sure. I don't know the answer to that question, Your Honor. You mean on a year-by-year basis? Well, it's a little funny because he only has, what, three years on this contract? The payout comes out over three years, doesn't it, here? No. Here, for Mr. Trantina, it goes on for the rest of his life because he's got the extended termination payments as well because he's over, it was over 65. Are there any expenses that he can, that he can take off against his, against his income? Against those termination benefits? Nothing in the contract would provide for that, no, Your Honor. And because he's no longer performing services for them, he would have no particular claim to, he would have no claim to charge State Farm with expenses. Realistically, if Mr. Trantina is able to convert this into a capital gain, a good lawyer could draft a contract for employment and almost inevitably convert it into a capital gain, wouldn't you say? I think any sort of retirement-type benefit, yes, could be characterized then as capital gain. Just convert it into an agency arrangement and voila. I'm about to look into that. I was thinking of my own. I think that, that covers the, you know, our position, obviously, that the asset, that the, the agreement was not an asset in and of itself and it created no property rights in Mr. Trantina. Unless the panel has any further questions. Thank you, counsel. Thank you. Thank you. I would just like to clarify a few items or issues. There was a question raised as to what Mr. Trantina took away on this termination. He took away his releases from his obligations, the lease for the premises, the lease for certain business assets and properties that were in the premises. So he actually did. But those weren't leased from State Farm, were they? Weren't they with a landlord and he bought the furniture from the ABC Furniture Company and he owned them? Yes. So that's a whole separate issue, isn't it? Well, but, but what happens here factually in this particular case is that the, the persons who took over, so to speak, his territory, and I believe there were four of them actually, occupied the same premises that he had. So they went to the landlord and said, we want you to terminate Mr. Trantina's lease. We'll take on. The landlord says, well, you don't have any history, credit, et cetera, et cetera. State Farm says, we'll guarantee the lease. Sure. But again, as Judge Bybee pointed out here, you're really talking about the assets that Mr. Trantina had. I mean, every, almost every insurance agent has his or her own quarters or they have a corporation, they have a, they have a lease and maybe they lease a car. They have a little business that they run and that's great. But what we're talking about here is the relationship between State Farm and Mr. Trantina. And I believe your allegation is that the contract itself is the capital asset. We don't talk about the others. I wanted to kind of distinguish, I think other judges perhaps did too. What, if anything, did he get out of the contract? Because the reality is that he didn't get anything out of the contract. He had certain things that he owned personally, but they had nothing to do per se with State Farm. Isn't that correct? Well, what he got out of the contract was money. I understand that. Yes. And that was, that was an agency contract. He had, they decided right from the get-go that they were going to reward his agent, as they do every other agent throughout the United States. Maybe that contract's not as sweet now as it used to be, but it's the same concept. And what you're saying is that any insurance agent, for that matter, why not every automobile dealer? Why not almost anybody that has an agency relationship can convert it? If the contract is terminated, you've got a capital asset. Well, I think automobile dealerships are different, but in this particular case with Trantina. Why? They're agencies. Because they're transferable. You can sell your agency. You don't have to tender it back to General Motors or Ford. In this particular case, what happens is, is that Mr. Trantina tenders his agency back to State Farm, who reissues it to, you know, multiple individuals, which is effectively a three-way sale. Thank you. This just argued will be submitted. The Court will stand in recess and return shortly as a reconstituted panel.
judges: Reinhardt, Bybee, M. Smith